UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  v.<br><br>CHRISTOPHER GEANAKOS,<br><br>        Defendant. | No. 2:13-cr-0404-GEB<br><br><br>**AMENDED ORDER**[1] |

The government moves for an order excluding the following evidence from the impending jury trial in this case, on which Defendant Christopher Geanakos relies in support of his insanity defense: (1) the report of Dr. Jennie Thomas, Psy.D.; (2) the report of Dr. Eugene P. Roeder, Ph.D.; and (3) the report of Christopher Mulligan, L.S.C.W. The government argues Geanakos "has provided notice of three expert witnesses who would testify in support of this defense" and that the evidence in the referenced reports

> is non-insanity psychological evidence that is expressly prohibited under Insanity Defense Reform Act, 18 U.S.C. § 17[; and that] the Court's gatekeeping function under Fed. R. Evid. 702 and 704 requires the exclusion of junk science that would link high-functioning autism with viewing child pornography—a theory that is unreliable and irrelevant to the affirmative insanity defense.

---

[1] The amended portion of the opinion is on page 4.

1

Mot. to Exclude 1:4-10, ECF No. 85.

> Geanakos opposes the motion arguing:
>
> The government seeks to exclude the testimony of Drs. Roeder and Thomas based on the position that these two experts have prepared reports that relate solely to mitigation and do not support either prong of the insanity defense as set forth in 18 U.S.C. § 17. Mr. **Geanakos agrees with the government's position that mitigation evidence is inadmissible to the extent it is not relevant to either prong of the insanity defense.** Mr. **Geanakos . . . does not concede that certain evidence from either Dr. Thomas or Roeder is inadmissible if it serves as foundation for Mr. Mulligan's opinion that Mr. Geanakos was insane at the time of the commission of the offense.**

Def.'s Opp'n to Mot. to Exclude 5:18-6:3, ECF No. 88 (emphasis added).

The Insanity Defense Reform Act ("IDRA") governs an insanity defense to a federal crime. 18 U.S.C. § 17.

> Under that Act, the defendant has the burden of establishing the defense by clear and convincing evidence, and must meet the statute's two-prong test. First, he must establish that he suffered from a serious mental disease or defect at the time of the crime. Second, his mental disease or defect must have prevented him from appreciating the nature and quality or wrongfulness of his acts.

United States v. Knott, 894 F.2d 1119, 1121 (9th Cir. 1990) (citations omitted) (citing 18 U.S.C. § 17). "As stated in 18 U.S.C. § 17(a), however, insanity only constitutes a defense if the defendant 'was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.'" United States v. Keen, 104 F.3d 1111, 1117 (9th Cir. 1996). Therefore insanity evidence that does "little more than establish that [a defendant] suffered

2

from a mental disease or defect—as opposed to establishing the effect that this condition had upon his ability to appreciate the nature of his actions"—is properly stricken. Id. "[T]he defense of diminished capacity only [applies] where the charged crime requires specific, rather than general intent. Because [the indicted child pornography crime] is a crime requiring only general intent, the diminished capacity defense does not apply." United States v. Larson, 346 Fed. App'x 166, 168 (9th Cir. 2009).

Neither the Thomas nor Roeder report contains sufficient reliable information pertinent to the insanity defense prescribed in the IDRA. The pertinent part of the Thomas report states:

> Because of Mr. Geanakos'[s] diagnostic impression within the Autism Spectrum, the level of emotional pressure he felt, his constant perception of needing to please or rely on others for approval, as well as pressure he felt and described as duress, as well as how easily he can be persuaded or pressured to comply with authority figures, such as the lead detective who appears to have contrived and elicited that he must write an apology to the children in alleged photos, and to admit to being fully cognizant that his activities were injurious to those children, insinuating that his admission could make the judge be more lenient on him, his immediate compliance need be looked at under a banner of caution. As Mr. Geanakos lacks the capacity or ability to process and perceive most common sophisticated and socially appropriate rules and communications, it is concerning to this clinician that he could have likely just mechanically or in a linear manner complied with the officers request, and may have likely admitted to a crime, with an intention he did not personally believe to have been correctly described, in his letter. Particularly as Mr. Geanakos was reported to not have fully understood that the underage girls in the pictures were real, therefore making his admission of his understanding of

3

>being fully aware that he was responsible of his actions being criminal in nature potentially invalid.

Thomas Report 31.

Dr. Thomas's statements that "Geanakos **was reported** to not have fully understood that the underage girls in the pictures were real, therefore making his admission of his understanding of being fully aware that he was responsible [for] his actions being criminal in nature potentially invalid," indicate that what Dr. Thomas says about Geanakos not having "fully understood . . . the underage girls . . . were real" merely repeats the opinion of the referenced unidentified reporting source.  Thus, the statements do not appear to express her own opinion.  Further, the statements are insufficiently explained and lack an inferential reasoning process establishing the reliability of the statements.

The most pertinent part of the Roeder report states:

>[Mr. Geanakos] knew what he was doing was against the law, Mr. Geanakos acknowledged, although he explained it was abstract, like death. . . . He said that he never bought into the thinking that what he was doing was right or victimless, but he would also not allow himself to think about what he was doing.
>
>. . . He looked down on people who did what he was doing by viewing child pornography, Mr. Geanakos said, describing it as "unnatural," but he also noted he did not allow himself to think about it.

Roeder Report 3-4 (emphasis removed).  The Roeder report does not address the elements of a federal insanity defense.

Conversely, the Mulligan report addresses the elements of an insanity defense as follows:

>In accordance with the diagnostic conclusions of Dr. Thomas, it is my professional opinion

4

> that [Geanakos] exhibits symptoms fully consistent [with a] diagnosis of high functioning ASD (hereafter hfASD). Prior to May 2013, at which time the diagnostic criteria for autism was modified for the DSM 5, [Geanakos] would have been diagnosed with Asperger's Syndrome. Due to his diagnosis of hfASD it is also my professional opinion that at the time of the offense conduct (approximately 2010 to 2013) Christopher did not have the capacity to understand the nature and quality of his actions or the capacity to understand the wrongfulness of his actions.

Mulligan Report at 2.

The government argues:

> Mr. Mulligan is not an expert on either of the two prongs relevant to an insanity defense:  the diagnosis of a severe mental defect or the linkage between the defect and a failure to understand that downloading child pornography is wrong.  Mr. Mulligan's educational background does not include any medical training . . . .  Here, Mr. Mulligan's testimony would not just be a component of the insanity defense:  it would be the cornerstone.  The diagnosis of a severe mental defect must come from someone who is qualified to make that medical assessment.  The testimony about the effects of the mental condition must also come from someone qualified to testify about causality.

Mot. to Exclude, 11:12-15, 12:4-7.

Geanakos's proffer concerning Mulligan's qualifications to opine on the insanity issue as follows:

> [Mulligan's] C.V. and . . . the "professional background" section of his report [evince he] is an expert in the assessment, evaluation and treatment of individuals affected by Autism Spectrum Disorder, "ASD."  Mr. Mulligan has been assessing, evaluating and treating these individuals for 24 years and is the founder and clinical director of Group Works West, and as such, for 17 years, has evaluated ASD patients and provided clinical care to more than 700 children, teens and adults.  Group Works West contracts with the Westside

5

>     Regional center to provide services for ASD
>     programs. The Westside Regional Center is
>     one of the state[']s largest public sector
>     agencies for funding ASD programs.
>
>     Mr. Mulligan's expertise is further
>     supported by his position as an adjunct
>     professor at University of Southern
>     California where he teaches assessment
>     methodologies and theory of human behavior.
>     He is also a licensed clinical social worker.
>
>     Mr. Mulligan's expertise has been
>     recognized in both State and Federal Court on
>     the "relationship between ASD and criminal
>     behavior, with an emphasis on the
>     relationship between ASD and sex offenses
>     [including possession of child pornography]."

Def.'s Opp'n to Mot. to Exclude, 6:6-7:9 (citations omitted) (quoting and citing Mulligan Report 2).

Concerning the admissibility of expert evidence, the Ninth Circuit states in Estate of Barabin v. AstenJohnson, Inc., 740 F.3d 457, 463 (9th Cir. 2014) (citations and footnote omitted):

>     Rule 702 of the Federal Rules of
>     Evidence governs admission of expert
>     testimony in the federal courts: If
>     scientific, technical, or other specialized
>     knowledge will assist the trier of fact to
>     understand the evidence or to determine a
>     fact in issue, a witness qualified as an
>     expert by knowledge, skill, experience,
>     training, or education, may testify thereto
>     in the form of an opinion or otherwise, if
>     (1) the testimony is based upon sufficient
>     facts or data, (2) the testimony is the
>     product of reliable principles and methods,
>     and (3) the witness has applied the
>     principles and methods reliably to the facts
>     of the case. We have interpreted Rule 702 to
>     require that "[e]xpert testimony . . . be
>     both relevant and reliable." Relevancy
>     simply requires that "[t]he evidence . . .
>     logically advance a material aspect of the
>     party's case."
>
>     [When the issue is reliability the
>     question is]: whether an expert's testimony

6

has "a reliable basis in the knowledge and experience of the relevant discipline." The "evidentiary reliability [is] based upon scientific validity." We are concerned "not [with] the correctness of the expert's conclusions but the soundness of his methodology." The duty falls squarely upon the district court to "act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards."

The reliability inquiry is "a flexible one." The Supreme Court has suggested several factors that can be used to determine the reliability of expert testimony: "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community."

"[T]he proponent of the expert . . . has the burden of proving admissibility." Lust v. Merrell Dow Pharmaceuticals, Inc., 89 F.3d 594, 598 (9th Cir. 1996). The government contends that the Mulligan report "contains no support . . . , no peer-reviewed research, no studies, no experiments[;]" and "is not grounded in science." Mot. to Exclude 14, ECF No. 85. Geanakos has not countered the motion with such support and relies on the contents of Mulligan Report itself and Mr. Mulligan's curriculum vitae.

Mulligan states in the relevant portions of his report:

Individuals with hfASD have great difficulty understanding the needs, interests, and motives of those around them and are referred to as "mind blind." They are prone to misinterpreting the behavior of others and fail to understand the ways in which people think about their own lives. Those with hfASD have difficulty socializing, particularly with their peer group, who are much less likely to make accommodations for their disabilities. They are more

7

comfortable and feel more competent with those who are younger.

. . .

The Court should be advised that there is not a single, definitive, test or diagnostic protocol to determine if a diagnosis of ASD is accurate in the adult population. For example, there is not a neuropsychological test, brain scan, genetic test, or blood test that can confirm a diagnosis of ASD.

Rather, the diagnosis is established by carefully reconstructing the subject's developmental, cognitive, and social history beginning in early childhood. This is accomplished by interviews with the subject and relevant collaterals such as parents, caregivers, teachers, and siblings. The diagnostic process can also involve a review of school records, employment records, and video tape of the subject as a child. In order to know how to conduct interviews and interpret records, the investigator must have both academic training and multiple years of clinical experience evaluating and treating children, teens, and adults with ASD.

. . .

In reviewing law enforcement documents and Dr. Roof's [the government's mental health expert's] psychiatric evaluation I read a letter that Christopher wrote to the "victims of child pornography." It is my understanding that the letter was written at the suggestion of a Detective Williams. The letter states that he is "sorry to have played a part in your (children) exploitation." The letter also states that "what happened to you (victims) was wrong and disgusting" and concludes with an apology: "I am so sorry. I know it (viewing child pornography) was wrong."

The letter appears to demonstrate that Christopher had sufficient moral development to make the determination that his actions were exploitative and therefore "wrong." However, the Court should be advised that even adults with hfASD are highly suggestible and easily manipulated, particularly by anyone that they hold to be in a position of

authority, such as law enforcement.

It is very likely that being asked to apologize to the victims suggested to Christopher that what he did by collecting and viewing child pornography was "wrong." Put in a different way, the letter could not have been the product of Christopher's ability to analyze his own sexual behavior, as this level of self-analysis is virtually impossible for person with hfASD without extensive therapy. Rather, it was likely prompted by the officer involved in the investigation. I am not suggesting that the letter was coerced, but was motivated by Christopher's drive to be compliant and follow directions.

The Court should be advised that children, teens, and adults with ASD are compliant to a fault; that is, they will follow directions and agree to engage in behaviors simply because they were asked or told to do so. The theory of mind skills and moral maturity needed to determine if the direction is reasonable, or in their best interest, is missing, which can lead to compliance with directions that are manipulative and ultimately self-destructive.

. . .

It is important to once again underscore that hfASD adults see themselves as younger than their calendar age and their severe limitations with same-aged peers confirms this perception. Looking at child pornography, especially featuring younger teens, then, is rational for an hfASD adult who sees himself to be a peer and therefore not engaged in deviant behavior.

As would follow, the hfASD adult may not be in any way sexually attracted to children, but simply curious about what the images contain. Indeed, hfASD adults often describe sexually explicit material as repulsive. While neurotypical adults may be similarly curious, their common sense and knowledge of social and legal codes inhibit them from following their curiosity, whereas the hfASD teen or adult typically has no such social or legal filter and, once he starts to gather a few depictions, becomes preoccupied with finding and saving images. In response to a

>question posed by Dr. Roof, Christopher reflected on his collection of child pornography: "The collection was the most important aspect. Really it was less about sexual gratification based on images in front of me. It was more about store and hold. I never really looked at what I would save."

Mulligan Report 4-5, 9-10, 12 (emphasis removed).

Geanakos has not established that Mulligan's opinions are "the product of reliable principles and methods," or that Mulligan "has applied the principles and methods reliably to the facts of the case." Estate of Barabin, 740 F.3d at 463. The report includes phrases such as, "Experts agree," and "Research indicates," Mulligan Report 10, 13, however other than use of these conclusory terms Mulligan makes bald statements about Geanakos's mental state, which are unsupported by a documented reasoning process. Geanakos argues that Mulligan's relies on "facts and data culled from the historical reconstruction of Mr. Geanakos'[s] developmental, cognitive and social history . . . [and that this] is the most reliable method for forming an expert opinion on hfASD." Def.'s Opp'n to Mot. to Exclude 15:14-19. However, this conclusory argument does not explain the reliability of Mullangan's opinions. "The court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed.R.Evid. 702 advisory committee's note (2000 amends.).

The Mulligan report also states Mulligan "ha[s] been asked to provide expert testimony in State and Federal Courts on the relationship between ASD and criminal behavior, with an emphasis on the relationship between ASD and sex offenses (including child pornography)." Mulligan Report 2. Merely being asked to provide expert testimony on a particular topic does not

10

evince whether the requested testimony was provided, the precise issue involved in the referenced proceeding, or whether whatever was at issue has any significant probative value on Mulligan's opinions in his report.

Neither Mulligan's report nor his curriculum vitae provide research, literature, or generally accepted methodologies within the field of autism in support of his conclusions.

> That the expert failed to subject his [undisclosed analytic] method to peer-review [sufficiently to explain his methodology] . . . is not dispositive, but if these guarantees of reliability are not satisfied, the expert 'must explain precisely how he went about reaching his conclusions and point to some objective source to show he has followed the scientific method, as its practiced by at least a recognized minority of scientists [or mental health experts] in his field.

Lust, 89 F.3d at 597 (alterations in original omitted).

Geanakos argues that Mulligan's experience providing clinical care to those with ASD renders Mulligan "more than qualified to have an expert opinion on hfASD." Def.'s Opp'n to Mot. to Exclude 15:9-10. Geanakos relies heavily on Primiano v. Cook, 598 F.3d 558 (9th Cir. 2010), in support of this argument which states:

> Despite the importance of evidence-based medicine, much of medical decision-making relies on judgment—a process that is difficult to quantify or even to assess qualitatively. Especially when a relevant experience base is unavailable, physicians must use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties to mak[e] a sound judgment.

Id. at 565 (alteration in original) (footnote omitted).

Primiano, however, is inapposite. In Primiano, an

11

orthopedic surgeon gave his opinion that an "artificial joint 'fail[ed] to perform in the manner reasonably to be expected in light of [its] nature and intended function.'" Id. at 567 (alterations in original). The surgeon explained the lack of published peer-review articles on the subject: "I wouldn't expect any literature, because you don't see it. It's hard to write a paper about something that doesn't occur. I mean, this is really bizarre." Id. at 566.

Mulligan's report, conversely, speaks mainly in generalities. For example, Mulligan states: "Individuals with hfASD have great difficulty understanding the needs, interests, and motives of those around them and are referred to as 'mind blind.'" Mulligan Report 4 (emphasis removed).

> "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." A trial court may exclude evidence when it finds that "there is simply too great an analytical gap between the data and the opinion proffered. . . . The reasoning between steps in a theory must be based on objective, verifiable evidence and scientific methodology of the kind traditionally used by experts in the field."

Domingo ex rel. Domingo v. T.K., 289 F.3d 600, 607 (9th Cir. 2002) (citation omitted) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).

Geanakos argues in his opposition: "[S]hould the Court want a more detailed proffer on an issue raised by these pleadings, Counsel request[s] that this Court set a Daubert hearing." Def.'s Opp'n to Mot. to Exclude 18. "[T]rial courts are not compelled to conduct pretrial hearings in order to

discharge the [Daubert] gatekeeping function." Alatorre, 222 F.3d at 1100.  Since the evidentiary record does show the reliability of the evidence in the reports notwithstanding the opportunity Geanakos has had to establish reliability, Geanakos has not shown that a further proceeding would be productive.  Therefore the request is denied.

For the stated reasons, the government's Motion to Exclude from the trial evidence in the reports is GRANTED.

Dated: January 26, 2017

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge